# United States Court of Appeals
## For the First Circuit

No. 00-1983

GAY OFFICERS ACTION LEAGUE ET AL.,

Plaintiffs, Appellees,

v.

COMMONWEALTH OF PUERTO RICO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Héctor M. Laffitte, U.S. District Judge]

Before

Torruella, Chief Judge,

Coffin, Senior Circuit Judge,

and Selya, Circuit Judge.

Russell A. Del Toro, with whom Camelia Fernández-Romeu and Del Toro & Santana were on brief, for appellant.
Suzanne B. Goldberg, with whom Judith Berkan, Berkan/Mendez, Ruth E. Harlow, Lambda Legal Defense and Education Fund, and Colleen M. Meenan were on brief, for appellees.

April 23, 2001

**SELYA, Circuit Judge.** In this bitterly-fought civil rights case, the district court awarded substantial attorneys' fees and ancillary expenses to a consortium of plaintiffs — the Gay Officers Action League (GOAL), Carroll Hunter, Thomas Jeans, and Dr. Rosalina Ramos Padró (collectively, the plaintiffs)[1] — against the Commonwealth of Puerto Rico. The Commonwealth appeals. Concluding, as we do, that the district court acted within its discretion in determining that the plaintiffs were prevailing parties with respect to a discrete claim in the underlying litigation, we affirm the finding that they were entitled to a fee award. Withal, we reduce the amount by nearly $40,000.

## I. BACKGROUND

On June 19, 1995, the plaintiffs sued the Commonwealth for damages and equitable relief.[2] Invoking 42 U.S.C. § 1983, they alleged, inter alia, that the Commonwealth violated their

---

[1]GOAL is a nonprofit organization comprising police officers dedicated to protecting the rights of gays and lesbians. Hunter and Jeans are members of GOAL and, at the times relevant hereto, were GOAL's principal officers. Ramos Padró is a lesbian activist resident in Puerto Rico.

[2]The plaintiffs named the superintendent and several members of the Puerto Rico Police Department (PRPD) as additional defendants. Since the presence of these defendants is of marginal relevance for purposes of this appeal, we treat the Commonwealth as if it were the sole defendant.

constitutional rights by (1) forbidding them from participating in an impromptu rally, (2) subjecting them to excessive force, (3) conducting an unlawful search of a gay bar, and (4) illegally videotaping a "Gay Pride" parade. Following a year of procedural wrangling and increasingly acrimonious discovery disputes, the plaintiffs amended their complaint to include, among other things, a claim that Regulation 29 — a police department regulation which made "associat[ing] with . . . homosexuals" violative of the code of conduct and exposed violators to official discipline — impugned the plaintiffs' First Amendment rights.

In due course, the district court (a) granted summary judgment in the Commonwealth's favor as to all claims anent the rally, the use of force, the search, and the videotaping; (b) left for trial certain (subsequently settled) claims against individual officers; and (c) entered a judgment declaring Regulation 29 unconstitutional. The last ruling is the focal point of this appeal.

The Commonwealth did not take the court's repudiation of Regulation 29 lightly. It filed a detailed motion to alter or amend the judgment. The district court stood firm. At that point, the Commonwealth, instead of throwing in the towel, decided to rewrite Regulation 29. The revised regulation no

longer singled out homosexuals in haec verba, but, rather, paved the way for disciplinary action against officers who "relate to or associate with persons of dubious reputation" (a group defined to include "anyone who engages in conduct that departs from the community's moral standards").

After the parties filed extensive briefs, the court rejected the revised regulation as an exercise in "crafty drafting" and a thinly-veiled effort to do by indirection what the court had prohibited the PRPD from doing directly. To insure against any future evasions, the court permanently enjoined the Commonwealth from punishing any police officer for associating with homosexuals.

Still unrepentant, the Commonwealth moved to vacate the injunction. After briefing and argument, the court demurred. This resolved the matter, as the Commonwealth chose not to appeal. The district court's decision on the merits thus ripened into a final judgment.

The plaintiffs thereafter petitioned for $209,122.67 in attorneys' fees and $21,294.92 in expenses. They accompanied the application with their attorneys' sworn statements, information concerning the attorneys' credentials, and a recasted version of the attorneys' contemporaneous billing records (which separated the work related to the extirpation of

Regulation 29 from other work performed). The Commonwealth filed an opposition.

Taking up the question, the district court first ruled that the plaintiffs were prevailing parties. It next scrutinized each attorney's hours and, notwithstanding the lawyers' assurances that they had eliminated all time spent on unrelated issues, subtracted some additional hours. The court then adjusted the attorneys' customary billing rates to reflect local stipends for comparably qualified counsel and trimmed (or in some instances disallowed) various expense items. When all was said and done, the court determined that the plaintiffs deserved legal fees in the amount of $202,733.86, allocated as follows:

1. Attorney Judith Berkan — 93.1325 hours at $240 per hour and 1.112 hours at $265 per hour, for a total of $22,646.48.

2. Attorney Suzanne B. Goldberg — 416.75 hours at $240 per hour, for a total of $100,020.

3. Attorney Ruth E. Harlow — 123.45 hours at $240 per hour, for a total of $29,628.

4. Attorney Colleen M. Meenan — 224.175 hours at $225 per hour, for a total of $50,439.38.

The court also awarded the plaintiffs a total of $13,787.40 in expenses.  This appeal followed.

We divide our ensuing discussion into three segments, one dealing with the standard of appellate review, the second with the plaintiffs' eligibility for a fee award, and the third with the dollars involved.

## II.  THE STANDARD OF REVIEW

In appeals involving the Fees Act, 42 U.S.C. § 1988, a reviewing court customarily defers to the trial judge, whose intimate knowledge of the nuances of the underlying case uniquely positions him to construct a condign award.  See Coutin v. Young & Rubicam, Inc., 124 F.3d 331, 336 (1st Cir. 1997); Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992). Accordingly, our review here is for manifest abuse of discretion.  E.g., Foley v. City of Lowell, 948 F.2d 10, 18 (1st Cir. 1991).  Apart from mistakes of law — which always constitute abuses of a court's discretion, see United States v. Snyder, 136 F.3d 65, 67 (1st Cir. 1998) — we will set aside a fee award only if it clearly appears that the trial court ignored a factor deserving significant weight, relied upon an improper factor, or evaluated all the proper factors (and no improper ones), but made a serious mistake in weighing them.

See Foster v. Mydas Assoc., Inc., 943 F.2d 139, 143 (1st Cir. 1991).

## III. THE FACT OF THE AWARD

The Commonwealth's attack on the fact of the award hinges on its contention that the plaintiffs were not prevailing parties in the underlying litigation (and, thus, not entitled to recoup fees and expenses at all). The district court rejected this contention, and so do we.

Under the so-called "American Rule," litigants generally pay their own way. Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975). Sometimes, however, Congress provides otherwise. The Fees Act, 42 U.S.C. § 1988, constitutes such a proviso. In regard to cases brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983, the Fees Act states in pertinent part that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). Although this fee-shifting provision is couched in permissive terminology, awards in favor of prevailing civil rights plaintiffs are virtually obligatory. See Stanton v. S. Berkshire Reg'l Sch. Dist., 197 F.3d 574, 576 (1st Cir. 1999) (explaining that the Supreme Court has interpreted section 1988 to require fees in favor of prevailing civil rights plaintiffs

-7-

"save for rare cases"); Casa Marie Hogar Geriatrico, Inc. v. Rivera-Santos, 38 F.3d 615, 618 (1st Cir. 1994) (noting that prevailing civil rights plaintiffs are presumptively entitled to fee awards); see also Blanchard v. Bergeron, 489 U.S. 87, 89 n.1 (1989). The threshold question, then, is whether the plaintiffs are prevailing parties within the purview of the Fees Act.

Typically, achieving prevailing party status requires a plaintiff to show that he succeeded on an important issue in the case, thereby gaining at least some of the benefit he sought in bringing suit. Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); Nadeau v. Helgemoe, 581 F.2d 275, 278-79 (1st Cir. 1978). Put another way, "a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." Farrar v. Hobby, 506 U.S. 103, 111-12 (1992); accord Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 791-92 (1989).

In this case, the plaintiffs "prevailed" in the sense that they secured declaratory and injunctive relief in their facial challenge to the constitutionality of Regulation 29. But obtaining equitable relief does not automatically confer prevailing party status for purposes of the Fees Act. See Tex.

State Teachers, 489 U.S. at 792-93; Rhodes v. Stewart, 488 U.S. 1, 3-4 (1988) (per curiam). An inquiring court always must make a qualitative inquiry into the import of the relief obtained, and the Commonwealth posits that the relief obtained here was so trivial that the plaintiffs cannot be deemed prevailing parties.

Insofar as this argument attempts to bundle the plaintiffs' Regulation 29 claim with their other (generally unsuccessful) claims, it lacks force. "[T]he degree of the plaintiff's success in relation to the other goals of the lawsuit is a factor critical to the determination of the size of a reasonable fee, not to eligibility for a fee award at all." Tex. State Teachers, 489 U.S. at 790 (emphasis omitted). Since the plaintiffs' effort to nullify Regulation 29 constituted a discrete claim within a larger case, our focus must not be on who won more claims, but on how the parties fared with respect to the Regulation 29 claim. If the plaintiffs' success on that discrete claim represented a meaningful victory, they are prevailing parties. Id. at 789-92; Hensley, 461 U.S. at 434-35. If, however, the plaintiffs' success on that claim was "purely technical or de minimis," a court would be well within its rights to deny prevailing party status. Tex. State Teachers, 489 U.S. at 792 (dictum). "Of itself, the moral satisfaction that results from any favorable statement of law cannot bestow

-9-

prevailing party status."  Farrar, 506 U.S. at 112 (citation and internal quotation marks omitted).

Turning to this analysis, the Commonwealth asseverates that the plaintiffs are not prevailing parties with respect to their Regulation 29 claim because the regulation was an anachronism which the PRPD never enforced and, in fact, had intended to scrap long before the plaintiffs sought a judicial anodyne.  This asseveration rests on the premise that winning an injunction against the enforcement of a moribund statute or regulation ordinarily is not enough to transform a plaintiff into a prevailing party.  See id.  We agree with that premise as an abstract statement of the law, but it has no application here for at least two reasons.

First, the PRPD never publicly repudiated the regulation before the plaintiffs challenged it, and the record contains evidence, credited by the district court, of its chilling effect on First Amendment rights.[3]  Thus, even if the PRPD harbored an unexpressed intention not to enforce Regulation 29, neither gay officers nor gay civilians who wished to associate with police officers would have had any way to know of that intention.  By convincing the court to strike the

_____

[3]For example, GOAL members testified that they felt obliged to arrange clandestine meetings with gay PRPD officers out of concern for the officers' careers.

regulation down, therefore, the plaintiffs at the very least dispelled a pall that burdened associational rights. Cf. NAACP v. Ala. ex rel. Patterson, 357 U.S. 449, 461-62 (1958) (discussing government activity that unconstitutionally discouraged individuals or groups from exercising freedom of association). Viewed from that perspective, the plaintiffs' decision to litigate the validity of Regulation 29, and the results that they obtained in that endeavor, accomplished something worthwhile.

Second — and perhaps more salient — the record does not support the Commonwealth's self-serving protestation that, even before the plaintiffs sued, Regulation 29 was a dead letter. From the moment that the plaintiffs called the constitutionality of Regulation 29 into question, the Commonwealth vigorously defended it. Instead of disowning the regulation or announcing that it had outlived its usefulness, the Commonwealth stridently opposed the plaintiffs' motion for summary judgment. When the court deemed the regulation unconstitutional, the Commonwealth did not acquiesce, but, rather, fought tooth and nail to reverse that decision. Even after the court declined to alter or amend the declaration of invalidity, the Commonwealth refused to abandon the regulation, preferring to tinker with its text in a benighted attempt to evade the thrust of the court's ruling.

-11-

It is trite, but true, that actions often speak louder than words. So it is here. The Commonwealth's course of conduct convincingly contradicts its current claim that Regulation 29 was an anachronism which the PRPD long had intended to rescind.

To sum up, the question of whether or not obtaining equitable relief is sufficiently meaningful to warrant prevailing party status is case-specific. In this instance, the record amply supports the district court's finding that Regulation 29 was extant when the plaintiffs took up the cudgels against it. Consequently, striking the regulation down achieved one of the plaintiffs' preeminent goals.

If more were needed — and we do not believe that it is — the Fees Act was intended to encourage citizens to vindicate rights that concern the public as a whole. See City of Riverside v. Rivera, 477 U.S. 561, 574-75 (1986). This suit is a paradigmatic example of the kind of case that Congress had in mind when it enacted section 1988. See Aubin v. Fudala, 782 F.2d 287, 290-91 (1st Cir. 1986) (explaining that declaratory judgments can further the policies behind the Fees Act). The court's declaration that Regulation 29 was unconstitutional clearly benefitted both the plaintiffs and the public as a

whole.  Writing off the plaintiffs' victory as de minimis would ignore that reality.

We will not paint the lily.  While many of the plaintiffs' other claims failed, the nisi prius court conclusively determined that Regulation 29 violated their First Amendment rights.  That decision settled a significant issue whose resolution benefitted the plaintiffs and the public.  Given this predicate, the district court did not abuse its discretion in concluding that the plaintiffs were prevailing parties for purposes of the discrete Regulation 29 claim.  A fee award therefore was due.

## IV.  THE AMOUNT OF THE AWARD

The second wave of the Commonwealth's offensive targets the amount of the fee award.[4]  Even if the plaintiffs are prevailing parties, the Commonwealth says, the award should be reduced because, among other things, it is disproportionately large; the plaintiffs failed to produce adequate records documenting their attorneys' time; the case was staffed too densely; and the court was overly generous in its treatment of

---

[4]On appeal, the Commonwealth does not challenge the expenses awarded by the district court.  Consequently, we deem any such challenge waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

-13-

overlapping issues.  We turn first to the anatomy of the award, and then examine the Commonwealth's contentions.

### A.  **The Anatomy of the Award.**

Under most federal fee-shifting statutes, including the Fees Act, the trial judge must determine "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  Hensley, 461 U.S. at 433.  In implementing this lodestar approach, the judge calculates the time counsel spent on the case, subtracts duplicative, unproductive, or excessive hours, and then applies prevailing rates in the community (taking into account the qualifications, experience, and specialized competence of the attorneys involved).  Lipsett, 975 F.2d at 937; United States v. Metro. Dist. Comm'n, 847 F.2d 12, 15-17 (1st Cir. 1988); Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 950-51 (1st Cir. 1984).

In fashioning fee awards, the attorneys' contemporaneous billing records constitute the usual starting point, but the court's discretion is by no means shackled by those records.  For example, it is the court's prerogative (indeed, its duty) to winnow out excessive hours, time spent tilting at windmills, and the like.  Coutin, 124 F.3d at 337.  By the same token, the court may take guidance from, but is not

-14-

bound by, an attorney's standard billing rate. See Brewster v. Dukakis, 3 F.3d 488, 492-93 (1st Cir. 1993).

Chief Judge Laffitte followed this procedure. He started with the time compilations submitted by the plaintiffs' lawyers. Despite the attorneys' representations that the compilations only included time spent in connection with their efforts to prove the infirmity of Regulation 29, the court sharply reduced the number of hours claimed for researching this issue prior to June 19, 1995 (the date on which the plaintiffs filed the original complaint that contained no mention of Regulation 29).[5] Turning to the other side of the grid, the court ratcheted some of the billing rates downward to correspond more closely with local standards. See Adcock-Ladd v. Sec'y of Treas., 227 F.3d 343, 350 (6th Cir. 2000) (holding that reasonable hourly rates should be set by reference to rates in the court's vicinage rather than in the lawyer's region of origin). The court then multiplied the adjusted hours by the adjusted rates to ascertain fees attributable to the work of

_____

[5]The court did, however, find that the work done by the attorneys on standing was interconnected with the Regulation 29 issue, and included the time spent researching that issue. The Commonwealth does not seriously challenge this finding and, in all events, the finding seems unassailable. See Aubin, 782 F.2d at 291 (explaining that plaintiffs are entitled not only to fees for work done on winning claims but also for work done on other claims involving "a common core of facts" or "related legal theories") (quoting Hensley, 461 U.S. at 435).

-15-

each of the four attorneys, aggregating those four figures to arrive at the amount of the award.

### B.    The Commonwealth's Rejoinder.

We address the Commonwealth's main arguments seriatim. Its other points are insufficiently developed, patently wrong, or both.  We reject them without editorial comment.

1.    **Proportionality.**  We need not tarry over the Commonwealth's assertion that the award is disproportionate to the degree of the plaintiffs' success.  While degree of success is critical in determining the amount of a fee award, Tex. State Teachers, 489 U.S. at 790, proportionality is no longer an issue once the prevailing party has separated the wheat from the chaff (i.e., isolated the time spent on her successful claim or claims).  See Hensley, 461 U.S. at 434-35.  Because the plaintiffs here have limited their fee petition to the solitary claim on which they prevailed completely, proportionality is no longer critical.[6]  See City of Riverside, 477 U.S. at 574.  The real question is to what extent the method of calculation, the

---

[6]This is not to say that proportionality may not, in some circumstances, bear upon the amount of an award.  E.g., Farrar, 506 U.S. at 113-16.  Here, however, we already have determined that the plaintiffs won a total and significant victory vis-à-vis Regulation 29.  See supra Part III.  Proportionality is therefore not a material issue at this stage of the case.

-16-

claimed hours and rates, and the associated documentation project a reasonable fee.

**2. Time Records.** The Commonwealth next complains that the very basis of the lower court's calculation is faulty because the plaintiffs neglected to produce contemporaneous time records. Without drawing our attention to any specific deficiencies in the records presented, the Commonwealth argues that the lower court erroneously accepted "shorthand summary compilations."

The facts are these. The plaintiffs provided the district court with four accounts — one for each lawyer — that synthesized, excerpted, and reproduced entries from the lawyers' original time sheets. The plaintiffs followed this praxis in an apparent effort both to segregate time spent on unsuccessful, unrelated claims and to create a more intelligible format for judicial consideration of their requests.

The district court welcomed these submissions and elected not to require the plaintiffs to produce the original time sheets. We discern no error. Our cases make clear that prevailing parties who intend to seek counsel fee awards ordinarily must ensure that contemporaneous time records are kept in reasonable detail. E.g., Lipsett, 975 F.2d at 938; Grendel's Den, 749 F.2d at 952. These precedents warn that

-17-

failure to do so may have deleterious consequences (such as the slashing or disallowance of an award). <u>Lipsett</u>, 975 F.2d at 938; <u>Grendel's Den</u>, 749 F.2d at 952. Here, however, the plaintiffs satisfied that obligation: each of the four attorneys filed an affidavit attesting that she kept contemporaneous time records. The fact that counsel, in helping to prepare the fee application, transcribed the notations on their time sheets verbatim and, for ease in reference, incorporated the transcriptions in compilations, did not compromise the integrity of their billing records. After all, the compilations simplified matters and enabled the lower court more easily to assess the merits of the parties' conflicting contentions. If the Commonwealth doubted whether the compilations faithfully tracked the time sheets, it could have filed a discovery request for the original records. Having eschewed that course, it cannot now be heard to complain that the judge, who expressed satisfaction with the accuracy and adequacy of the plaintiffs' proffer, did not demand to see the raw data.

    3. **Overstaffing.** The Commonwealth maintains that the plaintiffs overstaffed the litigation, drawing on a battery of lawyers when one would have sufficed. Such a claim brings

certain general rules into play. We briefly rehearse those rules.

On the one hand, awards under the Fees Act are not intended "to serve as full employment or continuing education programs for lawyers and paralegals." Lipsett, 975 F.2d at 938. In that spirit, a court should not hesitate to discount hours if it sees signs that a prevailing party has overstaffed a case. See Hart v. Bourque, 798 F.2d 519, 523 (1st Cir. 1986). On the other hand, courts must be careful not to throw out the baby with the bath water. Given the complexity of modern litigation, the deployment of multiple attorneys is sometimes an eminently reasonable tactic. Consequently, the mere fact that more than one lawyer toils on the same general task does not necessarily constitute excessive staffing. Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848, 860 (1st Cir. 1998). Effective preparation and presentation of a case often involve the kind of collaboration that only occurs when several attorneys are working on a single issue. Id.

The Commonwealth argues that the central legal question here — the constitutionality of Regulation 29 — was pedestrian, and that the engagement of multiple counsel therefore was unwarranted. But it is too much of a stretch to say that the First Amendment issue here was, in the Commonwealth's pat

phrase, "simple and straightforward." The Commonwealth's conclusion seems particularly dubious when one factors into the mix the ancillary issue of standing (a knotty problem, on these facts). See supra note 5.

The ferocity of the Commonwealth's defense likewise undermines its assertion that the plaintiffs did not need to call up the reserves in order to litigate the Regulation 29 issue. Although the Commonwealth now claims that it never particularly cared about the fate of the supposedly unused regulation, it certainly did not display any such indifference in the district court. To the contrary, it mounted a Stalingrad defense of Regulation 29, battling from rock to rock and tree to tree. After setting such a militant tone and forcing the plaintiffs to respond in kind, it seems disingenuous for the Commonwealth to castigate the plaintiffs for putting too many troops into the field. Cf. City of Riverside, 477 U.S. at 581 n.11 ("The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response.") (citation and internal quotation marks omitted).

Even so, we remain skeptical about the use of four attorneys to litigate a single claim — particularly a claim that did not necessitate a trial. Where tag teams of attorneys are

involved, fee applications should be scrutinized with especial care. Moreover, the level of scrutiny should increase in direct proportion to the number of lawyers employed. Despite these concerns, however, three things make us reluctant to interfere with the trial court's considered judgment in the peculiar circumstances of this case.

First, the trial judge had the best coign of vantage. He was uniquely positioned to weigh the parties' staffing needs, assess the reasonableness of their handling of the case, and evaluate the quality and relevance of the services rendered. Second, the judge explained his reasoning for allowing fees for multiple attorneys in meticulous detail. Third, the attorneys' proffer to the district court persuasively described their division of responsibility and their need for teamwork. Considering these and other factors, we conclude — although the question is close — that the court below did not abuse its discretion in determining that it was reasonable for the plaintiffs to have entrusted the Regulation 29 claim to a quartet of attorneys.

**4. Overlapping Issues.** When a plaintiff prevails on some, but not all, of multiple claims, a fee reduction may be in order. Hensley, 461 U.S. at 434-35; Coutin, 124 F.3d at 339-40. In such a situation, the court must filter out the time spent on

unsuccessful claims and award the prevailing party fees related solely to time spent litigating the winning claim(s).[7] Hensley, 461 U.S. at 435.  On appeal, the Commonwealth assails the district court's handling of the time spent by the various attorneys on overlapping matters, i.e., issues involving both Regulation 29 and other claims on which the plaintiffs did not triumph.  The Commonwealth's most powerful argument highlights a patent inconsistency in the trial court's otherwise exemplary rescript.  We trace the origins of this inconsistency.

In this case, the plaintiffs, mindful of the Hensley Court's directive that "[c]ounsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary," 461 U.S. at 434, limited their application to time spent on their one winning claim, allocating to that quest a portion of the hours spent on overlapping matters.  In scrutinizing the plaintiffs' submissions, the district court noted the way in which their attorneys had handled the vexing problem of how to account for time spent on overlapping claims.  The court

_____

[7]Of course, a prevailing party sometimes can avoid this sort of reconstructive surgery by a showing that the work done on unsuccessful claims was inextricably intertwined with the work done on successful claims.  See Lipsett, 975 F.2d at 940-41; Aubin, 782 F.2d at 291.  Here, however, the plaintiffs do not argue interconnectedness.

-22-

commended the methodology employed, declared that twenty-five percent of the overlapping time constituted a reasonable allocation for the Regulation 29 claim, and proceeded to fashion the fee award (with other changes, as described supra).

The fly in the ointment is that the court's computations did not track its statements: while the court awarded only twenty-five percent of the "overlapping" hours spent by two of the attorneys (Berkan and Meenan), it inadvertently awarded eighty percent of the "overlapping" time spent by the other two lawyers (Harlow and Goldberg). Because the court, to that extent, abandoned sub silentio its announced twenty-five percent formula, we think that a correction should be made.

We have several options at this point. We could, of course, remand for a new calculation. E.g., Coutin, 124 F.3d at 342. But remand is not obligatory, e.g., Lipsett, 975 F.2d at 943, and the court below was clear as to what it intended. Because the record is sufficiently explicit that we can perform the necessary calculations and implement the district court's stated plan, it would be wasteful to remand and invite a new round of litigation. Cf. Hensley, 461 U.S. at 437 (warning courts against turning fee applications into major satellite litigation). Thus, we forgo a remand and reduce Harlow's and

Goldberg's hours to include only twenty-five percent of the time spent by each of them on overlapping matters.

The majority of Harlow's allowed time — 116.5 hours — fell into this category. She included eighty percent of this time in her calculations. The district court adopted this figure. We enforce the court's twenty-five percent limitation by trimming that number from 93.2 hours to 29.125 hours. The net effect of this reduction is to decrease the overall award in regard to Harlow's services from $29,628 to $14,250.

We follow the same approach vis-à-vis Goldberg. She spent 183.75 hours on overlapping matters, and included 147 of those hours in her materials. The court adopted that figure. We enforce the court's twenty-five percent limitation by lowering that number to 45.9375 hours. The net effect of this reduction is to shrink the overall award in regard to Goldberg's services from $100,020 to $75,765.

V. CONCLUSION

To recapitulate, the district court labored over the underlying litigation for nearly five years. At the fee-shifting stage, the court issued a twenty-page opinion in which it supportably determined that the plaintiffs had prevailed on a significant aspect of their case. In the same opinion, the court closely evaluated each attorney's submission under the

-24-

appropriate legal standards.  For the most part, the court's reasoning is unimpugnable.  We therefore affirm the award, save only for a reduction to reflect accurately the court's sensible (but not fully implemented) determination that the plaintiffs should recover for no more than twenty-five percent of the time that their attorneys spent on overlapping matters.

We need go no further.  Although the fee award, even as we have pared it, seems quite generous, its size is dictated in large part by the tenacity with which the Commonwealth defended Regulation 29.  Cf. Galicians 6:7 (observing that "whatsoever a man soweth, that shall he also reap").  Under the circumstances, we scarcely can criticize the district court for determining, in effect, that the plaintiffs were justified in fighting fire with fire.

**The fee award is reduced from $202,733.86 to $163,100.86 and, as modified, the award is affirmed.  The expense award in the amount of $13,787.40 is likewise affirmed.  Interest shall accrue on these sums as provided by 28 U.S.C. § 1961.  No fees or costs shall be awarded for services rendered in connection with this appeal.**